Delahanty, and I, along with my colleague, Amelia Dalprau, represent the petitioner Manuel de Jesus Martinez. I'd like to...  Could I ask a question off the bat? What is the name of your client? Manuel de Jesus Martinez. Is our docket incorrect in saying, are we titling this wrong, or is your client's... Is Nova Martinez the correct name? The correct name is Manuel de Jesus Martinez. That's his birth name. It's found in his birth certificate in the record. At some point, it's unclear from the record, unclear from Ms. Martinez, the name Nova was inserted into it at some point during these proceedings. But we have the right case on the calendar, so I can have my heart rate return to normal? Yes, this is the right case, Your Honor. Okay, good. Yes.  Okay. I'd also just like to reserve five minutes for rebuttal. When did this get inserted? I'm just curious. It's unclear from the record, Your Honor. It appears to be at some point during the immigration proceedings. During the immigration proceedings? Yes. Okay. Not at this court. Mr. Martinez was harmed and faces future harm due to his severe mental health disabilities in El Salvador. His severe mental health disabilities include intellectual disability, formerly known as mental retardation, and schizophrenia, psychotic disorder. This court has previously held that people who are harmed on the basis of their disabilities are precisely the kinds of people the asylum statute contemplates. Here, the agency made at least two key errors in analyzing Mr. Martinez's PSG, particular social group, of Salvadorans with severe mental health disabilities who demonstrate perceptible psychosis. First, the agency found this group lacked particularity, and second, the agency found this group lacked social distinction. This court should grant the petition for review and remand Mr. Martinez's case to the immigration court on an open record. And turning to the first issue of particularity, particularity requires clear benchmarks to tell who's in the group and who's out of the group. In Acevedo-Granados, this court held that medical diagnoses, and specifically DSM-5 diagnoses, are clear benchmarks. Right, and he's got the same DSM diagnosis. Yes, Your Honor. Straight up. He has intellectual disability, which is the same DSM-5 diagnosis from Acevedo-Granados. Exactly. And he had not only that, he's got an expert, quite a capable one in this case, who said that he's got the lowest score she's seen on his intellectual functioning testing. So it's an extreme case, but what about the way the PSG was articulated? The way the PSG was articulated is Salvadorans with severe mental health disabilities who demonstrate perceptible psychosis, and here the severe mental health disabilities captures both Mr. Martinez's intellectual disability and also his, excuse me, Your Honors, also his schizophrenia with psychosis. It's a really tough sell, right, because we have to, because of Acevedo-Granados. The problem is whether or not, you know this of course, but whether the boundaries of the group can be established. And what they found, my colleagues found in that case, was that intellectual disability is actually a term of art, if you will, in the DSM. And I think your client's records very clearly show he's got that term of art, but the way the PSG is articulated is significantly broader. Yes, Your Honor. Okay, so you want, can you speak to that? Yes. On CAR 529 to 531, which is Mr. Martinez's pre-hearing brief to the immigration judge, he defines his PSG specifically around the contours of his DSM-5 diagnoses. He doesn't use the wording specific to the DSM-5 diagnoses, but on those pages he lists exactly what he has, intellectual disability and schizophrenia, psychotic disorder, and says that the PSG here reflects the contours of those groups. Well, the diagnosis that we found cognizable is intellectual disability, not schizophrenia. Intellectual disability with a capital I and a capital D, right? But this is a tough case because that opinion wasn't available at the time of the IJ's hearing. It came out after the IJ's hearing, and for some reason there was quite a delay here in the case being issued. I'm not sure what happened there, but there was quite a delay. It was available by the time the case got to the BIA. Yes? Yes, Your Honor. That's right. Okay, and then on his behalf there was a request to reformulate the PSG. Yes, there was a motion to remand back to the IJ. Okay, and I think that the, I'm just going to tell you for both of your sakes, the way I read the record is that the BIA articulated why it thought your client didn't satisfy the test, or how to distinguish it from what we wound up with having two cases, right? Bookends is what I refer to them as. But I don't see a response to the request or an explanation for the request to remand. Was there one? No. Our position is that the BIA did not respond to the motion to remand. They simply analyzed it as part of their overall analysis of the appeal brief. And Mr. Martinez filed the motion to remand because this court's case, Acevedo-Bernado's, came down in 2021, which was two years after the immigration court hearing here. And he filed immediately to- But before the BIA? Before the BIA. Okay. And he filed immediately in order to be able to go back to the immigration judge to cast the facts in his case in light of this court's holding in Acevedo-Bernado's, which is factually very similar to Mr. Martinez's situation. Well, shockingly similar. That's the problem. And it's an extreme case. At least I'll just say that for both of you. So that's my impression. So you can correct me if you think I'm wrong. The BIA denied the request? Yes, they denied the request. Without explanation? They did not provide sufficient explanation here. They simply applied the law of Acevedo-Bernado's to the facts as they existed. That's a different explanation. That's the other request, but not the remand, wasn't it? Yes. Yes, Your Honor. The remand to allow you to reformulate. In other words, it's one thing to say, you know, you don't fit under the facts of that case because you've articulated a different PSG. I don't see a response to the request to allow you to reformulate the PSG under these circumstances as a severely disabled individual. That's right. I don't know that they would have to let you do that. I'm not suggesting it was an abuse of discretion. I'm just trying to figure out whether there was an answer to the request. And so for both of your benefits, I don't see it, so. That's right, Your Honor. And if I may turn just briefly to talk about the schizophrenia part of Mr. Martinez's PSG. This court in previous cases has held that the focus of the court and the analysis should be on the heart of the claim. And that's from Antonio. And here, the heart of this claim is Mr. Martinez's severe mental health disabilities, which include intellectual disabilities as the primary one. And furthermore, in Diaz-Renoso, this court also held that simply because there's a suffix limiting the group in a way, for here would be the psychosis, which refers to schizophrenia, that that shouldn't be a poison pill and sink the particularity of the group. Because Mr. Martinez's diagnoses do provide the contours of who is in this group and who's outside of it. And I'll turn briefly to social distinction now, which requires that the society in question recognize a group of people who share a common characteristic to be a group. And here, the record is filled with evidence of social distinction of Mr. Martinez and his group. For instance, he was called a slur by numerous people in El Salvador. He was called Manuel Pepel, which is a reference to a supposedly blank mind. And that is a direct reference to his intellectual disabilities and mental health issues. In Enosiveta-Granados, this court held that if individuals are treated badly because they manifest a certain condition, that treatment by itself suggests that people with that condition are viewed as socially distinct because they've been singled out for mistreatment. The IJ in the hearing... The persecution he's suffering, I mean, just to be candid, first time through, he was immediately recognized as being severely disabled by the asylum officer and by the supervisor. But at that point, he said something that was deemed untrue. He later said, I was told to say that and it wasn't right. It's extraordinary because he was still found credible. I mean, he comes across from this record, I say this as much for government's counsel's benefit, so you can correct me if I'm wrong, he's still found credible. So the record reads as though someone who's really severely intellectually disabled, who would make that admission. But I think he's got this claim of economic persecution because he literally wasn't allowed to work in the fields to support himself. So this is a difficult case. Yes, Your Honor. The first time he testified before the asylum officer in 1999, where he was recommended a grant for asylum, he did testify that he was attacked on the basis of his intellectual disability. But that wasn't true. That in the 2019 hearing, he did recant that. But in his appeal brief, he maintained that that happened and that he also has severe memory issues and he has extreme difficulty in communicating in Spanish. Well, the IJ certainly wasn't required to accept that testimony. And I don't know if that happened or not. We can't tell here, but he's deemed credible despite all this, which is quite extraordinary on my read. Yes, he's deemed credible. And the fact that also before the asylum officer and it was apparent before the IJ as well, of the extent of Mr. Martinez's impairment. I just want to ask one other kind of random question. I don't think I've ever seen a case, I don't believe I've ever seen a case where somebody actually was approved for asylum and then doesn't show up for the last appointment, the fingerprinting or something. And then 20 years later, but nobody in the briefing explains any legal significance to that prior approval. Is there, there's no argument made along those lines, is there? There's no argument made along those lines, Your Honor. But it is true that he was approved and it's not clear from the record, but it is clear from Mr. Martinez, who is a person, that his intellectual disability contributed to him missing that final step, that fingerprinting appointment. Okay. I've taken you beyond the time I think you wanted to reserve. Judge Forrest? That's right, Your Honor. Okay. I don't think we have any other questions. Okay. Thank you. Thank you. At least not at this point. Good morning, and may it please the Court, Richard Stampede on behalf of the Attorney General. So just turning to the first, I'm going to dispense my opening just for a second to mention, the earliest documents in the record at 610 and 614, the notices to appear, the equivalent of the charging documents, they say Nova Martinez. The very beginning documents actually say that. So we think the case is styled correctly, at least based within the record of— I appreciate that, and I appreciate the reassurance of it.  So in terms of—let me just work a little bit backwards here in terms of the credibility issue. The immigration judge could have done what's called a matter of RKK inquiry. That case was not brought up here, I'm not bringing it up to cite—  But you might see that in certain, say, Indian asylum cases where there are certain safeguards that kick in. We've had a couple of cases involving that test this week. So the immigration judge, though, knew that he was going to be granting temporary protected status. There was really no dispute between the parties that the applicant appeared eligible for temporary protected status. Had the immigration judge found that it was a knowing and willful lie that had been told in 2001, potentially that could have barred the applicant from any relief for life under the Immigration and Nationality Act. And the immigration judge chose not to go down that road, perhaps taking into account memory issues or whatnot, but he also appreciated the applicant's candor in terms of saying that, yes, this was not true, what I said back in 2001. So— I don't know if he even said that. I think he said, somebody told me to say that. Right. So yes, the immigration judge said—I'm sorry. No, no, no. You're not interrupting it. But I did have the sense that he was just sort of parroting what he'd been told and was pretty candid about that. Well, yes, although the applicant had not included that in his written statement. It did not make part of the pre-hearing brief. And so finally, the immigration judge says, what about this attack with the machete? Did that even happen? And that's when the applicant says no. And so then the immigration judge sort of just flowed from that. Well, who told you to say that? And he said, well, a friend. And so there potentially could have been a situation where the immigration judge was going to pull that thread. And the immigration judge understood, though, he was about to, since he's doing an extemporaneous oral decision, he was going to grant temporary protective status, which he wouldn't have been able to do if he had seen it that way. So I've been pretty candid about my assessment of this case because it seems to be such an extreme, such an outlier with the qualification right away. And this speaks highly of the agency, I think, a recognition of the Franco Gonzalez class, getting him. He had counsel, not only just to say cards, all of them, and pretty unusually thorough expert reports, it seems to me. And then he scores, you know, in a she says the word she'd seen. And so I struggle with what's the right answer here, particularly because he, in his medical records, really psychological testing, he's got the very same diagnosis, as you well appreciate. And there was a request because of this funny timing. I don't know what held up Acevedo Granados, but there was, it was not available at the time of the IJ hearing, and this PSG was formulated the way it was formulated. And then by the time it got to the BIA, that case law did exist, and there was a request to remand to reformulate. Can you can you speak to that? Sure, I can talk to two points in there. So first of all, as far as the motion remand is concerned, bear in mind, particularly pages 44 and 46, which comprise the motion to remand. In that motion, Petitioner argues because of Acevedo, I win with these particular social groups. It's, it's in the it's in the brief sort of a bit of puffery. The BIA said no. The BIA said because of Andrade. So the BIA points out, like, look, we understand you're making this legal argument that you're you hereby win because of Acevedo. Andrade comes out and says, no, no, Acevedo did not put the imprimatur upon this formulation because what you what you have from Timu to Acevedo to Andrade, and even even now, they're all sort of parroting each other because Timu was successful. And so they they're sort of following a little bit of those story beats there as they hit those same structure. A little bit of what? The story, this this structural aspect of Timu, that there's sort of a statement of a condition, a statement of behavior. So whereas in Timu, they were saying, all right, well, we found the social distinction because the Tanzanians refer to Mwenda Wubenzu as individuals who have or are thought to be demon possessed. Acevedo proffers, but the court in Acevedo says, wait a second, the immigration judge treated intellectual disability as a sort of a lay person might do. But oh, that's in the DSM-5. Firm of art. Correct. Right. That's right. I'm sorry. No, no, please. So then we get to Andrade. Andrade is much more of an umbrella term, which is happening in this case. So the second point I was going to raise just about the motion remand is the second point is any applicant can go into immigration court and they do every day in this circuit and across the country and propose multiple particular social groups because that's tactical. If I walk in and say, say, just let's take a different illness, let's say bipolar. If I come in and say my client has bipolar disorder and is prone to the following behaviors, then the advocate will understand that the immigration judge is going to look for documentation about someone with bipolar disorder. But sometimes you might want to cast it larger. But advocates can still have multiple alternative grounds. Some advocates will, and this is true, will offer as many of it as it doesn't. Right. They will drop off by the time they get to the board. They will also filter out by the time you get to federal court or down to a few or just a couple. But nothing stops the advocate from proposing many groups and saying it's in one of these. Sometimes it might be only transposing a couple of words, but the immigration judge has to go through all of them because, of course, if they don't, then an advocate will spare no ink saying the immigration judge didn't address this group. The ability, let me put it this way, the agency is not an advocate. The agency has to look at what is presented to it. What are you telling me? You can see, particularly pages 78 to 80, the immigration judge is metaphorically throwing up his hands saying I'm looking for social distinction here. I'm caught up on because they've put the word severe. It's not just schizophrenia or bipolar disorder or pick your illness. It's severe. You've given this umbrella term. You've also said they're prone to odd behavior, but your witness, your lead expert has said you might not know he has it at page 192. So the immigration judge at one point, even at page 79, I think might literally have thrown up his hands and said if there's a higher, he points to the board and says if the board can tell me where social distinction of Salvadorans with severe mental health disabilities who demonstrate perceptible psychosis is in the record, please point me to that. He wasn't begrudging a remand on that front. He was looking for tell me where I should look. I'm not faulting the IJ. I fully appreciate that. My hypotheticals really go to what do we do about this is an exact match and it is sort of a Diaz-Renoso problem because I'm not, what I can't tell is whether the BIA appreciated the second request that he made. I read the record the way you do, sir, where by the time he got to the BIA, his argument was we win because of Acevedo-Granados and the BIA explained why that was not the case. Sorry, Andrade. Yes. Andrade. And you just explained, I think, very cogently, but there was another request there, again, I'll be straight up about the fact that I'm viewing this light of the severity of this disability and the other request was would you let me go back and reformulate my PSG. And, you know, we typically say you chose your PSG, right? And so I'm not faulting the rationale, the reason about why that PSG didn't work. But it's difficult because I don't see any response to the request to go back and reformulate and it does seem to me that but for that PSG, he clearly qualifies. He's got the intellectual disability diagnosis, you know, just in the same way that the previous litigant had. So I want to give you a chance to respond to that.  Yes, Your Honor. So we think in light of Andrade, because the suffix of Andrade and the way that the what of Andrade? The suffix, the tail end of Andrade. Oh, OK. Yeah. OK. About who are exhibiting erratic behavior. And so Andrade sort of points out like, OK, Acevedo dealt with the first half of that definition. Well, is intellectual disability in the DSM? This person in Andrade has done more of an umbrella or sorry, in Acevedo, they have something that's actually in the DSM, even if they're using it in layman's terms, they don't reach the suffix. Andrade says, we've reached the suffix. And the board is pointing out that there's multiple aspects because when you present a multifaceted particular social group, that's unfortunately multi opportunities for something to fall short. It's a tactical decision to try and cast a wider net because you might want to make sure that under social distinction, you get caught, you can catch more, you can get caught more and have applied more. But then, as Andrade pointed out, that's also the undoing, at least when it comes to demonstrating some or demonstrating perceptual psychosis. Again, I'm not for purposes of where I'm at now in this analysis, I'm not salting that. I don't see an answer by the BIA to the request to allow him to reformulate. So we think we man, I think it's that motion to remand is denied, essentially for a second bite of the apple. Well, is the is the PSG here? Does it have the words perceptible psychosis? Yes. Sure. Well, it seems to me that that that is different from erratic behavior. Erratic behavior could could could describe any kind of odd behavior. We all know people who behave erratically at times. It's very broad, but a perceptible psychosis is something that you, you know, hits you between the eyes. It seems to me that's different. What? So we think that's actually something that the immigration judge struggled with. It's a question of fact. And in fact, in particular, pages 77 and 192, the immigration judge is pointing to the lead expert saying that this person may be experiencing these, although to be fair, the person stopped experiencing the symptoms once he was out of detention, but the person is experiencing symptoms. But you wouldn't. Someone on the street might not know it that that. And so the idea is the immigration judge is trying to understand and there's a factual determination that's going on on the part of the immigration judge to determine. Does this even fit in the proposed group? Does the applicant's behavior, is the applicant you presented to me, the immigration judge, is this fitting in the group that you're trying to offer me? Well, the classic person who thinks he's Napoleon, that's pretty perceptible, isn't it? It might, right? But so, I mean, of course, that didn't. I understand. That's not the situation. Right. No, this is all internal. Like this is him expressing the things that he was thinking or thoughts he might hear, voices he might hear that he might not even, I mean, to be fair, the expert said, well, he would behave oddly. So I mean, what's erratic behavior? What's perceptible psychosis? What's odd behavior? I mean, at some point, the fact finder has to look at this and determine, did this fit into... So is that a fact question? This is not a perceptible psychosis? We think it's a fact question that this applicant didn't fit into the proposed group. I know you've heard me say this during the course of this argument. 20 plus years ago, the asylum officer immediately recognized this person. And then we have this test score that I've mentioned that the asylum officer supervisor also immediately recognized. And then he was approved on this basis. So when I put that together with the fact that he has the diagnosis and the problem, I think what the government is really saying, and I appreciate where the government's coming from is that wasn't the PSG. That's not what he chose. And you've used the word tactical decision and so on and so forth, which I appreciate. But he also requested, his lawyer requested an opportunity to go back. When the first decision came out, Acevedo-Granados, I think there was an attempt to employ the erratic behavior moniker without recognizing what that case is really saying. It's really saying something different. And that was clarified when we have what I call the bookend case. Andrade came out and I think made the rule of law clear, but they didn't have the benefit of that at the time before the PSG. So he was clearly asking for a do-over. I don't know if the BIA needed to give him the do-over, but I don't think the BIA, and I'm inviting you to let me know if you think I'm wrong, but I don't see why or they did anything other than say a motion to remand denied. So Your Honor, because they're engaging so much over Andrade, the point is they're saying your legal arguments are pointing to Acevedo's. We're saying this is all wet because Andrade undercuts it. He made two requests. One of them was, as you very, I think, correctly identified, his first argument was I should win because this case law, and the BIA explained why you don't win under that case law. He also asked, I think acknowledging that that PSG, if it didn't fit his other request was, would you let me reformat it because this guy should qualify? And I don't see where the, that's my paraphrase, and I don't see where the BIA ever answered that, sir. They just said denied. So we think it's as they engage with the request, the point, as they're engaging with the request, and inexorably the request is tied to Acevedo. They're saying. I don't think so. I think those are two different requests. That's why we're missing each other. Well, we think because they're saying we want to do over because we're going to try and use Acevedo to prevail. When first of all, they could have presented in multiple particular social groups to start. That's the tactical argument that you've made and that I appreciate. I understand it. Oh, so. Go right ahead. Go right ahead. We've taken you over. Go right ahead. So that's the board recognizing that, that yes, I mean, if the board comes out, the board did not come out and say, you may not have a do over. That's not, that doesn't appear in the record, but we think implicit in the motion to remand is saying what you're asking for isn't something you're, you're eligible for, and they, they lose on immutability for the second group. They lose on social distinction for the second group and the first group. The whole point is you don't get to, as the board actually does say in its decision, not having the evidence viewed the way you want does not mean that, that something went wrong below. And the board understood what illnesses that he was about to had. They understood the record that the IJ had engaged the evidence. They just didn't see it. What they clearly understood is that he didn't qualify with that PSG. That's what their clear ruling was. And I, I fully appreciate that, but I've taken a lot of extra time. Do you have any additional questions, Judge Forrest, Judge Schroeder? No, we don't. Sir, thank you for your patience with our questions. I appreciate that very much. You have some minutes left for rebuttal. May it please the court. You pull the microphone down so you'll probably get like a snore neck that way. Go right ahead. May it please the court. Amelia Delpra for the petitioner. Two points on rebuttal. First, I just want to emphasize Mr. Martinez's motion for name change is on car 557 to 59, which includes his birth certificate, noting the name. Okay. Thank you. The government's wrong when stating that Mr. Martinez's group is not cognizable. First I want to address Andrade. This court's decision in Andrade was confined to the suffix erratic behavior, which the court noted can be used in a variety of contexts outside of the medical. Additionally, it's not defined in the record and no one contested that it was defined in the record. This case is unlike Andrade for those reasons, and we also don't have the term erratic behavior in either of our PSGs. First, I want to discuss particularity. Mr. Martinez's pre-hearing brief on car 29 to 31, he explained to the immigration judge that his PSG was limited to people who have his specific DSM-5 diagnosis. What page? This is car 529 to 31. This is pre-hearing brief to the immigration judge. We also want to say that even if his PSGs could have been clearer, we should look to the heart of the claim, as Antonio has articulated, and we should also not be too mechanistic, as this court in Diaz-Reynoso noted, because Mr. Martinez's heart of his claim is that he has had a lifelong disability, which this court noted. He had the lowest cognitive assessment that the mental health evaluator found, and additionally, he only had a second grade education. I understand that. You're distracting me with your citation to Diaz-Reynoso. I think to fit within the Diaz-Reynoso hypothetical, you would have to have a PSG that included intellectual disabilities and something that made it overly broad, and what we said there, again, I'm paraphrasing, is that if he's got the PSG in there, he's not going to be disqualified by having something else, again, over a simplification, but your PSG didn't have that, right? That's what you're trying to grab onto. He's got the diagnosis. That's the irony. He's got the diagnosis. Yes, he does have the diagnosis here. So when we read Diaz-Reynoso, we note that they talk about the principles of asylum. We don't want our findings around a PSG to contradict with the principles of asylum, and people with disabilities were precisely the individuals that our asylum law contemplates with the words particular social group, as this court explained in Trocova. I also want to discuss social distinction. It was an error under this court's precedent in prior BAC, Acevedo-Granados, and Acosang-Vibar, for the agency to ignore categories of evidence in its social distinction analysis. For example, they ignored that Mr. Martinez was called a slur, was pretextually denied field work because he was unable to read. Why do you think they ignored that? On CAR... I'm trying to figure out how this fits into the legal analysis that's troubling us. On CAR 78-79, the immigration judge does not grapple with Mr. Martinez' experience of mistreatment. They also failure to recognize the specific laws in El Salvador that single out people with intellectual disabilities. Come again and explain, understanding how this helps your PSG argument. This helps us with the social distinction. Under Acosang-Vibar, it's important for the social distinction analysis to consider the experience of mistreatment that an individual has experienced that demonstrates that they are treated as a distinct group, and it's also important under prior BAC to consider country conditions reports and the specific laws like the Public Notaries Act that singles out people with intellectual disabilities. On CAR 439, saying that they cannot be public notaries, I also want to note there are general laws in El Salvador, which is important for the social distinction analysis, and the agency failed to consider an eight-page expert affidavit explaining how disabled adults like Mr. Martinez face harm and face persecution, harm, and are more susceptible to violence than other adults in the society. I just don't hear the government really contesting those points. Those are all considerations for the social distinction analysis, and so we believe that this indicates their social distinction. I know I'm out of time, but I want to point out that the motion to remand was denied without explanation and that was timely filed after this court came down with Acevedo-Granados in 2021. If there's no further questions, we would urge this court to grant Mr. Martinez's petition for review and to remand for further fact-finding on an open record. Thank you. I don't think my colleagues do have additional questions, and I don't either, but I want to thank both of you for your advocacy and your patience with our questions. This is a troubling case, and we appreciate your help with it very much indeed. We're going to just say officially that that marks the end of our calendar today, but before we stand in recess, we want to take a minute to mark a special day. We're going to say goodbye to Susan Gelmas. She's been a very long-time member of the court, and it's going to be really tough to see her go.
judges: SCHROEDER, CHRISTEN, FORREST